IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JEREMY PAUL MIMS                                                    PLAINTIFF

        v.                            Civil No.  12-5243

SHERIFF TIM HELDER; and
DR. HOWARD                                                       DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff under the provisions of 42 U.S.C. § 1983.

When Plaintiff filed the case, he was proceeding *pro se* and *in forma pauperis.*  Subsequently,

counsel was appointed to represent him.[1]

Plaintiff's claims arise out of a period of incarceration at the Washington County Detention

Center (WCDC).  Plaintiff claims his constitutional rights were violated in the following ways: (1)

Dr. Howard was deliberately indifferent to his serious medical needs; and (2) Defendants retaliated

against him for filing this lawsuit by denying him access to medical care.

The case is before the Court on the motion for summary judgment (Doc. 44) filed by the

Defendants.  Plaintiff has responded (Doc. 48) and Defendants filed a reply brief (Doc. 50).

## 1.  Background

On August 14, 2012, shortly after his arrival in jail in Louisiana, Plaintiff suffered a seizure

lasting approximately one minute and fell off a stool hitting his head.   Defendants' Exhibit 1 at

---

[1] Charles M. Kester and his associate Joseph C. Hall, of the Kester Law Firm, were initially appointed to represent the Plaintiff.  They filed the response to the summary judgment motion on Plaintiff's behalf.  Subsequently, Mr. Kester passed away unexpectedly and his law firm disbanded.  The Court then appointed Zoe Elizabeth Naylor to represent the Plaintiff.  However, Ms. Naylor was informed that she need not do any work on the case until the summary judgment motion was resolved.

AO72A
(Rev. 8/82)

pg. 7 (hereinafter <u>Defts' Ex.</u>).  He was transported by Emergency Medical Services to the Pointe Coupee General Hospital in New Roads, Louisiana.  <u>Id.</u>

Upon arrival, "pseudoseizures" were observed but no "postictal[2] symptoms" were noted. <u>Id.</u> at pgs.  3 & 23.  Plaintiff reported a long standing history of epilepsy.  <u>Id.</u> at pg. 5.  Plaintiff's Dilantin levels were noted to be sub-therapeutic.  <u>Id.</u> at pg. 14.

Plaintiff admitted to drinking an "8 pack of beer daily, with case of beer daily x 3 days" and smoking "2 pack(s) per day."  <u>Defts' Ex. 1</u> at pgs. 5 & 8.  Plaintiff also had marijuana in his system.  <u>Id.</u> at pg. 14.  Plaintiff was prescribed Dilantin 100 mg. to be taken three times per day. <u>Defts' Ex. 1</u> at pg. 14.

On August 17, 2012, Plaintiff  was booked into the WCDC on charges of aggravated robbery and kidnaping, and on a hold for another department.  <u>Defts' Ex. 3, Doc. 46-3</u> at pg. 10.[3] It was noted on his medical intake form that Plaintiff reported having seizures and being on Dilantin and Seroquel.  <u>Id.</u> at pg. 13.

On August 18, 2012, jail nurse Peggy Vickery called a jail physician and noted that Plaintiff was on an abnormally large dose of Dilantin, a standard anti-seizure medication, and that she had been unable to confirm the dosage with the local hospital to which Plaintiff directed her. <u>Defts' Ex. 2</u> at ¶ 4; <u>Defts' Ex. 3, Doc.46-3</u> at pg. 14.  Plaintiff had reported taking six doses of Dilantin per day.  <u>Id.</u>  Nurse Vickery was instructed to give Plaintiff five doses of 100 mg. of Dilantin, three doses in the morning and two doses in the evening, until his Dilantin levels could be checked on the following Monday.  <u>Id.</u>

---

[2] Postical means following a seizure.  http://www.medilexicon.com/medicaldictionary.php

[3] Defendants' Exhibit 3 is divided into a number of cm/ecf documents consisting of approximately fifty pages each. For this reason, the Court will also indicate the <u>Doc. No.</u> on citations to <u>Defts' Ex. 3</u>.

Dr. Howard is the jail physician at the WCDC.  Defts' Ex. 2 at ¶ 1.  He indicates he first learned of Plaintiff's incarceration in the WCDC when he was contacted on either August 18th or 20th by a nurse at the jail.  Id. at ¶ 3.

On August 20th, Plaintiff's Dilantin levels were checked and were at 47, which Dr. Howard indicates is a dangerously high level with therapeutic levels being 10-20.  Defts' Ex. 2 at ¶ 5.  According to Dr. Howard, such high levels can be counterproductive in "regards to seizure activity and can have other negative side effects, most notably liver damage."  Id.

When contacted by Nurse Rhonda Meschede about the Dilantin reading, Dr. Howard ordered that no Dilantin be given on the evening of the 20th or on the 21st, after which the dosage was to be lowered to 3 doses of 100 mg. of Dilantin per day.  Defts' Ex. 2 at ¶ 5; Defts' Ex. 3, Doc. 46-3 at pg. 15.  This regimen was to continue until the 27th, when the Plaintiff's Dilantin levels were to be checked again.  Id.

On August 22nd, Plaintiff submitted a grievance.  Defts' Ex. 3, Doc. 46-3 at pg. 16.  The grievance states: "Medical is not giving me the medicine I came in with.  I don't know what medical is giving me.  It will be a problem when my lawyer finds out about this.  And, I am not paying for my [own] medicine.  I had 90 pills.[4]"

On August 26th, Plaintiff submitted another grievance stating he still had not been given the medication he had brought with him.  Defts' Ex. 3, Doc. 46-3 at pg. 17.  He indicated he was familiar with the color of his medications and this was not what he was receiving.  Id.  Nurse

---

[4] The grievances submitted with the summary judgment motion were partially illegible.  Defendants were directed to supplement the record with a better copy (Doc. 59).  They did so (Doc. 60).  However, the digital copy in the Court's Case Management/ Electronic Case Files (CM/ECF) database is still partially illegible.  Defense counsel also delivered paper copies of the grievances and they are legible.  These grievances will be conventionally filed as a supplement to Document 60.

Bradley responded that Plaintiff had only come in with ten tablets and they had already been used. Id.

On August 27th, Plaintiff's Dilantin level was checked again and was 22.2, still above the therapeutic range, but much closer than before and no longer dangerously high in Dr. Howard's opinion. Defts' Ex. 2 at ¶ 6. On August 28th, Dr. Howard saw Plaintiff for the first time. Id. at ¶ 7. Dr. Howard noted that the Plaintiff was taking Dilantin, but still reporting seizure activity. Id. Since Dr. Howard could not prescribe a larger dose of Dilantin and because Plaintiff reported sleeping problems, Dr. Howard added 60 mg. of Phenobarbital, another standard anti-seizure medication with sedative properties, in an attempt to better control Plaintiff's seizure activity and to allow him to sleep. Id.

On September 25th, Plaintiff was seen by Dr. Neil Mullins, the other physician at the jail. Defts' Ex. 2 at ¶ 8. At that time, Dr. Mullins discontinued the Phenobarbital prescription, apparently based on Plaintiff's complaints. Id. Dr. Mullins continued Plaintiff's Dilantin prescription. Id.

On September 30th, Nurse Meschede called Dr. Howard to report that Plaintiff was reporting seizure activity and asking to be moved to medical holding. Defts' Ex. 2 at ¶ 9. Dr. Howard instructed Nurse Meschede to move Plaintiff to medical holding, to re-check his Dilantin levels on October 1st, and to place him on the doctor's list. Id.

On October 1st, Plaintiff's Dilantin levels were checked again and were 24.2, still high as compared to the therapeutic range. Defts' Ex. 2 at ¶ 10. At 11:57 a.m., a notation was made that Plaintiff was not to be given Dilantin that day. Defts' Ex. 3, Doc. 46-6 at pg. 19. On October

11th, Dr. Mullins checked Plaintiff's Dilantin levels at Washington Regional Medical Center and they were down to 12.8, well within the therapeutic range for Dilantin.  Defts' Ex. 2. at ¶ 11.

Dr. Howard did not see Plaintiff again until February of 2013, when he saw him twice in regards to his complaints of a sleeping problem.  Defts' Ex. 2 at ¶ 12.  Dr. Howard indicates that Plaintiff did not mention any seizure problems during either of those visits.  Id.

Dr. Howard indicates that lifestyle choices like drug, alcohol, or tobacco use and/or withdrawal from these substances can cause increases in seizure activity.  Defts' Ex. 2 at ¶ 13.  In his opinion, Dr. Howard found no evidence to believe Plaintiff suffered any worsening of his seizure activity or that any changes in his medications occasioned such a worsening.  Id.  On the contrary, Dr. Howard indicates the changes brought Plaintiff's Dilantin level back into a therapeutic range.  Id.

On February 2nd, Plaintiff submitted a grievance indicating he needed his Dilantin level checked.  Defts' Ex. 3, Doc. 46-3 at pg. 49.  He submitted a second grievance that same day that provides as follows: "that I'm writing is more then just a bar of soap.  It's about your medical staff.  And how they go about [assisting detainees with] these medical needs.  As a [sic] inmate in a state jail, I feel like my medical needs should be [attended to] a lot[] better then [sic] they are.[5]"  Id.

Dr. Howard indicates he does not choose the patients he sees in doctor calls.  Defts' Ex. 2 at ¶ 14.  He indicates the nursing staff compiles the doctor call list.  Id.  Dr. Howard states he never refused to see or treat the Plaintiff for any reason.  Id.

Dr. Howard also states that Sheriff Helder had no personal involvement in Plaintiff's medical care or treatment.  Defts' Ex. 2 at ¶ 15.  Likewise, Sheriff Helder states he was not

[5] A copy of this grievance was also hand delivered to the Court.

-5-

involved in Plaintiff's medical care in anyway.  Defts' Ex. 3 at ¶ 4.  He states he has no involvement in the preparation of doctor call lists and never instructed anyone not to see or treat the Plaintiff for filing this lawsuit or for any other reason.  Id.

The medication logs indicate the following with respect to the administration of Dilantin:

*Plaintiff's initial prescription was for Dilantin 100 mg., 1 tablet three times daily;

*on August 18- 20, 2012, Plaintiff received two doses of Dilantin;

*on August 21st, Plaintiff received no doses;

*with the exception of October 1st, when Plaintiff only received one dose of Dilantin, he received three doses per day from August 22nd until October 2nd;

* Plaintiff's prescription changed to four times daily beginning on October 4th;

*with the exception of November 20th and 21st, when he received only two doses, Plaintiff received four doses daily from October 4, 2012, to July 8, 2013.

Defts' Ex. 3, Doc. 46-5 at pgs. 4-50.  During his incarceration, Plaintiff also received on various dates the following: Phenobarbital; Amitriptylene; Tylenol; Tofinate Cream; Ivory Soap; Lamisil Cream; Benadryl; Hydrocortisone Cream; Lotion; and Dandruff Shampoo.  Id.

The WCDC has a grievance procedure which allows inmates to "complain about problems or objections they may have or request medical care or other accommodations."  Defts' Ex. 3 at ¶ 3.  According to Sheriff Helder, supervisory staff respond to the grievances and requests "in a manner intended to resolve as many issues/complaints as possible."  Id.

Sheriff Helder states that Plaintiff never complained in writing about: (1) any objections to his Phenobarbital prescription or complaints about the detrimental health effects of that prescription; (2) any objection to any cessation in his Dilantin prescription or complaints about detrimental health effects of that prescription; (3) any alleged increase in the frequency or severity

-6-

of seizure activity (or even about having a seizure at all); (4) any objections to, or problems arising from, his choice of a bed on the top tier of his pod or any request for assignment to a lower tier; or (5) any alleged retaliation, in the form of denial of access to medical care or otherwise, for filing this lawsuit or for any other reason.  Defts' Ex. 2 at ¶ 3.

### 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

Defendants have moved for summary judgment on both Plaintiff's denial of medical care claim and his retaliation claim.  Plaintiff in response indicates he is no longer pursuing the retaliation claim.  He also indicates he is no longer pursuing any individual capacity claims.

-7-

These concessions by Plaintiff eliminate the need to address a number of Defendants' summary judgment arguments.  The remaining issues are: the timeliness of the motion; whether Plaintiff exhausted his administrative remedies before he filed suit; whether there is any evidence of an unconstitutional policy or custom; and whether there is proof that any of Defendants' actions caused Plaintiff physical injury.

### (A).  Untimeliness of the Motion

Plaintiff first argues that the Defendants' summary judgment motion should be denied for untimeliness.  This argument is meritless.  The Court granted Defendants' unopposed motion for an extension of time to file their summary judgment motion on or before March 13, 2014.  The summary judgment motion was filed on March 13, 2014.  The summary judgment motion was deemed by the Court to have been timely filed (Doc. 53).  Plaintiff was not prejudiced by the Defendants filing of the summary judgment motion within the time frame specifically agreed to by him.  The fact that the Court may not have ruled on the extension request until after the summary judgment motion was filed is of no import.

### (B).  Exhaustion of Administrative Remedies

Because a finding that Plaintiff failed to exhaust his administrative remedies would require dismissal of this lawsuit, I will address this argument next.  Defendants maintain Plaintiff submitted no grievances about the following: (1) his Phenobarbital prescription or complaints about any detrimental health effects of that prescription; (2) any objection to the temporary cessation of his Dilantin prescription or complaints about detrimental health effects of that prescription; (3) any alleged increase in the frequency or severity of seizure activity; and (4) any objections about his choice of a bed on the top tier of his pod or any request for assignment to a lower tier.

AO72A
(Rev. 8/82)

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory.  Porter v. Nussle, 534 U.S. 516, 524-25 (2002).  In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." Id. at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Id.  "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

The Supreme Court in Booth v. Churner, 532 U.S. 731, 738-39 (2001), held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought."  Walker v. Maschner, 270 F.3d 573, 577 (8th Cir. 2001).  The exhaustion requirement applies to "all inmate suits about prison life."  Porter, 534 U.S. at 532.  This is true whether the claims "involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. Id.

-9-

In <u>Williams v. Norris</u>, 176 F.3d 1089, 1090 (8th Cir. 1999), the Court held that a claim could proceed because it was exhausted at the time the Court ruled.  In <u>Johnson v. Jones</u>, 340 F.3d 624 (8th Cir. 2003), the Court was faced with this issue and concluded that in light of the Supreme Court holdings in <u>Booth</u> and <u>Porter</u>, the holding in <u>Williams</u> was "no longer tenable."  <u>Johnson</u>, 340 F.3d at 627.  The Eighth Circuit stated that:

> [u]nder the plain language of section 1997e(a), an inmate must exhaust administrative remedies *before* filing suit in federal court.  Thus, in considering motions to dismiss for failure to exhaust under section 1997e(a), the district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred.  If exhaustion was not completed at the time of filing, dismissal is mandatory.

<u>Id.</u>

Plaintiff maintains he did exhaust his administrative remedies by filing grievances in August of 2012, before initiation of this lawsuit.[6]  Further he states he submitted a grievance in February of 2013 prior to his filing of the amended complaint.

As noted above, in the grievance dated August 22, 2012, Plaintiff was asking why he was not receiving the medication he had brought to the jail with him.  In the August 26th grievance, Plaintiff complained that he still was not receiving the medication he brought with him.  <u>Plaintiff's Exhibit 4</u>.  He indicated he knew the color of his medication and the ones he was receiving were not his.  <u>Id.</u>

Plaintiff's grievance dated February 2, 2013, was filed after this case was commenced and in it Plaintiff only complained of needing his Dilantin level checked.  This case was filed on November 15, 2012.  As stated in the <u>Johnson</u> case, the grievance must be filed *before* filing suit

---

[6] In his brief, Plaintiff states he submitted a grievance in July of 2012.  This is obviously a mistake as he was not incarcerated at the WCDC in July.  Furthermore, the exhibit he refers to is dated August 22, 2012.

-10-

AO72A
(Rev. 8/82)

in federal court.  Johnson, 340 F.3d at 627.  The February 2013 grievance is therefore irrelevant to the issue of whether Plaintiff exhausted his administrative remedies prior to filing suit.

The WCDC requires a grievance to "state fully the time, date, and names of those detention officers and/or staff members involved and pertinent details of the incident, including the names of any witnesses."  Defts' Ex. 3, Doc. 46-3 at pg. 4.  The grievances submitted by Plaintiff only address the issue of why he was not being given the medication he brought with him to the jail. The grievances do not mention an increase in seizure activity, problems with the prescriptions he was receiving, or problems with his bunk assignment.  Plaintiff failed to exhaust his administrative remedies prior to filing suit.  This case is therefore subject to dismissal.  However, in order to provide a full record for review, the Court will address below the merits of Plaintiff's claim.

### (C).  Denial of Medical Care--Official Capacity Claims

"Under the Eighth Amendment's proscription against cruel and unusual punishments, prison officials must provide medical care to inmates."  Hines v. Anderson, 547 F.3d 915, 920 (8th Cir. 2008)(internal quotation marks and citation omitted).  "A prison's medical staff violates the Eighth Amendment if they commit acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs."  Meuir v. Green County Jail Employees, 487 F.3d 1115, 1118 (8th Cir. 2007)(internal quotation marks and citation omitted).

To establish a prima facie case, Plaintiff must demonstrate that:  (1) he suffered from an objectively serious medical need; and (2) Defendants actually knew of, but deliberately disregarded, that need.  *Id.*

With respect to the official capacity claims, they are "functionally equivalent to a suit against the employing governmental entity."  Veatch v. Bartels Lutheran Home, 627 F.3d 1254,

1257 (8th Cir. 2010).   In other words, the official capacity claims are treated as claims against

Washington County.  See Murray v. Lene, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality cannot be held liable on a *respondeat superior*

theory, that is, solely because it employs a tortfeasor." Atkinson v. City of Mountain View, Mo.,

709 F.3d 1201, 1214 (8th Cir. 2013).  To establish Washington County's liability under § 1983,

"plaintiff must show that a constitutional violation was committed pursuant to an official custom,

policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir.

2009)(citation omitted).  The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1)
> where a particular municipal policy or custom itself violates federal law, or directs
> an employee to do so; and (2) where a facially lawful municipal policy or custom
> was adopted with "deliberate indifference" to its known or obvious consequences.
> *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). There need not
> be a finding that a municipal employee is liable in his or her individual capacity
> before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th
> Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity
> or supervisory official may be held liable under § 1983 even though no government
> individuals were personally liable."). Where an official policy is itself
> unconstitutional or directs employees to take unconstitutional action, no evidence
> beyond a statement of the policy and its exercise is necessary to establish § 1983
> liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

Id. at 817-18.

Here, Plaintiff has made no showing of the existence of an unconstitutional county policy

or custom.  Plaintiff argues that Washington County's policy "is that a seizure is not among the

grounds to call emergency medical assistance." Doc. 48 at pg. 4.  Plaintiff asserts that WCDC

nursing staff routinely refused to provide him with emergency medical care when he experienced

seizures.

The written policy provides as follows:

-12-

1.  <u>Emergency Definition</u>: Any of the following occurrences shall constitute an emergency, and the presence of one shall be grounds to call emergency medical assistance:

a.      Severe Bleeding
b.      Unconsciousness
c.      Serious Breathing Difficulties
d.      Head Injury
e.      Severe Burns
f.      Severe Pain
g.      Sudden onset of Bizarre Behavior
h.      Any other health or life threatening condition deemed to be an emergency by a detention facility officer.

<u>Defts' Ex. 3, Doc. 46-3</u> at pg. 7; <u>Plff's Ex. 2</u>.   The policy does not preclude the calling of emergency medical assistance when an inmate is having a seizure.  In fact, the policy gives detention center staff the discretion to deem any other health or life threatening condition an emergency.  <u>Id.</u>

The gist of Plaintiff's claim is that because the policy did not specifically enumerate seizures as a condition calling for emergency medical assistance, that it precluded the provision of emergency medical care for seizures.  However, this ignores the fact that detention center personnel are not limited to the conditions enumerated but may deem any other health or life threatening condition an emergency.  <u>Defts' Ex. 3, Doc. 46-3</u> at pg. 7; <u>Plff's Ex. 2</u>.  The fact that Plaintiff's seizures were not deemed an emergency does alter the fact that detention center personnel may, in the right conditions, deem a seizure as requiring emergency medical treatment.

While Plaintiff states he asked on multiple occasions to be taken to the hospital when he had seizures, there is nothing in the medical records to support this assertion.  Further, Plaintiff admits he never asked to go to the hospital in writing and never asked Dr. Howard.  <u>Plff's Ex. 1</u> at pgs. 43-44.  Even if he did ask medical staff to go to the hospital following a seizure on more

-13-

than one occasion, their refusal merely constitutes an exercise in medical judgment.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)(inmates have no constitutional right to a particular course of treatment, and medical staff remain free to use their independent medical judgment). Clearly, Plaintiff's allegations are insufficient to establish the existence of an unconstitutional policy or custom.

### 4.  Conclusion

For the reasons stated, I recommend that Defendants' summary judgment motion (Doc. 44) be granted and this case dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 12th day of February 2015.


/s/ *Erin L. Setser*
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE